Gregory Garmon v. Nat'l Railroad Passenger Corp. Mr. Tombetta. Thank you, Your Honor. Good morning. Chris Tombetta for the appellate. Gregory Garmon. In this case, Mr. Garmon claims that he was subjected to discrimination while he was employed by Amtrak. He asserts various grounds. The first is overtime discrimination. He claims he wasn't provided certain keys to canisters. He asserts that he didn't receive training as to SED diagrams. And he also claims that he wasn't essentially recognized in connection with meetings, safety meetings. There were some things that were preliminary to that, too, when he was put on nights and what he needed to do to get back to days. There were also issues with respect to employees not speaking to Mr. Garmon as well. One of the primary issues has to do with the overtime discrimination. And what Mr. Garmon says is prior to late 2012, he, Bill Butler, and Chris Alves, she had overtime on an equal basis. There were three of them. They rotated it essentially on a weekend. One would have two if somebody turned it down. Whoever was next in line could get it. And they rotated it. And they had done that, I believe, for more than five years. Then in late 2012, which I believe was December, Bill Brennan, who was the supervisor at that point, says, well, I want Jim Thackerberry, a foreman, to participate in this first shift overtime. And what he does is he includes Mr. Thackerberry in this overtime rotation. But to do it, he just doesn't add him to the rotation. So he rotates with everybody the way that the prior three were doing. What he does is he says, well, Mr. Garmon, you're going to share your slots with Mr. Thackerberry. Mr. Garmon says, well, wait a minute. Now my availability as to overtime is going to go down because I'm not going to get the rotation. I'm going to share with Mr. Thackerberry. And the availability as to me with respect to overtime goes down. Now the question is he claims that that's racism. And why does he claim that's racism? The first reason is there's no reason for that situation to exist. Initially, Mr. Thackerberry is a foreman. He's put on the schedule. The question is, well, why? Because he's sharing the same slot that Mr. Garmon would have shared on that particular day. Counsel, are you saying the decision is irrational as a business matter and from that you can draw an inference that the motivation was racial? Is that your basic argument? Well, Your Honor, I think that's one of it. And it is irrational because there is no reason. Okay. Let's assume it is not irrational that there is a good business reason for it or even a bad business reason for it. It's just that's the employer's decision. What other evidence is there in this record that that decision taken in 2012 was racially motivated? Well, Your Honor, I think the history of the treatment as to Mr. Garmon demonstrates that his treatment at that time was based on racial motivation.  Yes, Your Honor. And I thought the claims of a supervisor refusing to talk to him dated back before the four-year period of the statute of limitations. Well, Your Honor, I think that's true with respect to, you know, an actionable claim on that. But I think the other thing that's important is to look at the treatment of Mr. Garmon over time. So four years later or how many years was it? Six years later after a comment is made or not made, that's evidence that this 2012 decision to include a supervisor in overtime was racially motivated? No, Your Honor, because there are other instances, too. Okay, tell me what they are and tell me temporarily when they took place. Well, there was the safety supervisor, Mr. Candace. She didn't pay attention to Mr. Garmon in these meetings. And the thing that's important to understand here is that this is a racism case. And, you know, maybe it's unconscious. And the only thing I can remember, and this was a long time ago when I was a law school, she said, you know, with respect to racism, it's not so much these outward comments because you don't see it. She goes, it's when you go and you see somebody and subtly these things happen. And I think that's what's happening here. That may all be true, but would you please answer my question? Yes, Your Honor. In 2011, Mr. Candace left. Prior to that, he didn't pay any attention to Mr. Garmon when he was in these safety meetings. I believe it was, I think it was 2005. If we go back that far, Mr. Brennan provides on-the-job training with respect to these SED diagrams. He never provides it to Mr. Garmon. So over time. I thought the evidence was Mr. Garmon declined to engage in such training. That's absolutely right. I disagree with that, Your Honor. Or was it that he did get some of the training? Later on, he may have gotten some by Mr. Thackerberry, not by Mr. Brennan, but it was not a substitute for what he should have received from Mr. Brennan. And Mr. Garmon's knowledge. Did he ever request that training and was denied it? Well, Your Honor, I think you're putting Mr. Garmon in a difficult position at that point because it wasn't like, hey, I'm just going to give the training to these two guys. Mr. Brennan takes Mr. Garmon and puts him in a room and says, put this paper together. Basically, he's saying, I'm giving it to them, I'm not giving it to you. And after that, they go ahead and they do the work. And there's no reason to do this based on the fact that they may be HROs or not HROs. I mean, the use of these diagrams is with respect to the construction of the work as to the railroad. Cantilevers, weights, that's what happens. And those are the individuals that make the decisions during this construction. And Mr. Garmon doesn't. And I don't know if I used the word gopher in my papers, but essentially that's what he was. Did he ever ask for that training and was turned down? I don't know if he ever asked for it. I know that Mr. Thackberry, I believe, provided him with some. Can I ask about a fact that I don't quite know what to do with it? As I read the decision below, it's decided at the prima facie case level for lack of causation. Correct? Yes, Your Honor. Okay. In the typical case, if I'm an African-American employee and I'm terminated and I'm replaced by a white employee, that is enough at the prima facie level to get going. Here, I guess the equivalent would be if he was denied an overtime slot, the only people who then got the opportunity that was taken from him, if they were all white, that might be similar to the circumstance where if I'm a black employee and I'm fired and a white employee replaces me, I get past causation at the prima facie level. But here, one of the people who gets the benefit of the shift change is black. Is that true? Your Honor, to a very small degree. And with respect to Mr. Bendigo, what they're trying to say is, hey, look, we're going to put Mr. Thackberry in this position and take away Mr. Garment's overtime. Now, Mr. Alves absorbs a great amount of the overtime up top with respect to the HROs. This Mr. Bendigo is in the rotation for five months. The bottom line is, okay, we can't get rid of him and maybe they don't care. But I guess the reason why I'm pressing on it is for purpose of the prima facie case, you might draw the conclusion they really don't like Mr. Garment. But the question is, do they really not like him because of his race? And the fact that to punish him they're willing to benefit somebody of the same race seems to cut against the idea that at the prima facie level, we have an inference that the harm done to your client was done because of his race. Now, if you have other evidence, that might bump it across. But just like if Mr. Garment was fired and he was replaced by a black employee, we wouldn't say, well, the fact that he was fired and he was black was enough to get you past the prima facie level because there would be no inference to be drawn from that given who replaced him. Why isn't that the same problem here? Well, I think the extent to which Mr. Vendigo obtained any overtime was minimal and was only for five months. Then everybody's white. I don't think there's any issue as to that. And the bottom line is I'm taking something from somebody who is black, okay, and there's this rotation that comes in which is new anyway. And one of the people from these other shifts happens to be black who is eligible for these positions if they become available because Mr. Alves decides not to take it. So the opportunity for that person is minimal. And maybe that's something that they can tolerate because it's not a big deal. But the bottom line is when we go back to Mr. Thackerberry and he comes in and he takes this position, it's wrong and it's wrong for several reasons, okay. Why can't he rotate with the HROs if he's an HRO, which he is. How can he take a position that belongs to Mr. Garmin which can be filled by alignment and he's a foreman? The fact that he's a foreman is irrelevant. And then when we file this case a year later, they come up with a new plan and they say, oh, by the way, we're going to have three positions. Is that evidence in the record? Yes, Your Honor. It's in Mr. Garmin's affidavit. What year is there a new plan? It's 2014. And I admit that's somewhat unclear and I believe it's page 823 in the record where Mr. Garmin says, hey, this went into effect about two weeks ago. And the other reasoning for that is also because the complaint says 2013. Okay, thank you. Thank you, Your Honor. May it please the Court, Your Honors. I'm Lisa Burton here on behalf of the defendant, Apelli Gamtrak. I think, quite honestly, Your Honors, where I'd like to start this focus is on the fact that there is actually no evidence of race discrimination under 1981, either as a hostile environment or as disparate treatment, and the lower court ruling should be affirmed. I think, as Judge Lynch, you correctly noted, most of the allegations regarding any discriminatory treatment because of Mr. Garmin's race occurred well before 2009, which would have been the relevant time period. And, in fact, when you look at the deposition testimony cited in the record, Mr. Garmin acknowledges that many of the instances he claims are evidence of race discrimination really don't support his claim. As Mr. Trumbetta noted, he claims he didn't have access to canisters. But, in fact, the record establishes that no linemen had access to canisters. So, therefore, it's not based on his race. The next allegation was, of course, the diagrams. And, as the Court correctly noted, Mr. Garmin did admit during his deposition that he was trained when everybody else was trained. And, in fact, during his deposition, which is cited in the record, he noted he never asked to be additionally trained on that. With regard to the next aspect, he claims about the treatment about Mr. Elves, I believe, and Mr. Brennan not speaking to him. Again, he claims that ended in around 2008. And then, finally, about this issue of Mr. Thackerbery somehow being put on so that he would not get overtime. Again, Mr. Thackerbery was put on the shift in 2008. He applied for the shift. So, therefore, there was no placement of anybody into the first shift lineman position. And, in fact, throughout this entire process, the system never changed. The union was in charge of overseeing the overtime process? The district court assumed arguendo that the system had been changed in 2008 or, I'm sorry, in 2012, but that there was no evidence that it was tied to racial animus. The process, Your Honor, never changed as far as the union, pursuant to the collective bargain agreement, which was part of this record, is the entity that oversees the assignment of overtime. The railroad, Amtrak, decides what is needed based on the operational needs of the railroad. And, in fact, you will see in our record that the amount of overtime available each year changes. I believe in one year there was very little overtime. In 2009 and 2010 it was significantly higher. In 2011 the amounts changed. Again, that's because of operational needs, which, as you noted, Judge Lynch, clearly is in the decision-making factor of the railroad. Those are its business judgments and decisions. Mr. Garmon always had access to the first shift overtime. And Mr. Garmon was not an HRO. His comparators, Mr. Alves and Mr. Butler, were HROs. And Mr. Garmon did testify that he had the opportunity to become an HRO, like Mr. Bendigo, and he chose not to. Therefore, he chose not to have the opportunity to bid for those other things. And, in fact, he further testified that he oftentimes turned down overtime because he didn't generally want to work overtime on Sundays.  So are you asking us to affirm the decision below that there was not a prima facie case made here, or are you asking us to affirm on the alternative ground that even if there was, there was no evidence of discrimination that could go to the jury? Well, Your Honor, since this Court is allowed to look at this de novo, I would state that it can affirm on both grounds. First, he never makes his prima facie case. Okay, with respect just to the prima facie case point, if we assume, for purposes, bear with me, we assume that there was a change in the way overtime was allocated, and if that change resulted in the one African-American member of the group now having less opportunity to get overtime, and all the people who benefited from the change were white, would that meet the causation test under the prima facie standard? It would not. Why not? Because they're not similarly situated. They're in different positions, Your Honor. Mr. Garman, again, was the first shift lineman, a position that he held for many years, and a position which he chose never to seek to go above. The other gentlemen, Alton Butler, and also Bendigo and the folks on the other shift, were HROs. Those are high operator railmen. They have a different set of duties, and they can do things that Mr. Garman cannot do. So, therefore, just looking at the fact of that. And if there's a dispute in the record as to whether those differences mean that they're similarly situated or not, in other words, in a relevant way, is that a question for the jury to determine? Well, I think, Your Honor, those are different jobs by definition. I know they're different jobs, but I guess the question of their relevance to an allocation decision, in other words, although they have different jobs, the question of whether they're similarly situated isn't just are there differences between them, it's are there relevant differences between them. And isn't that the kind of thing that a jury could determine? I believe, Your Honor, that actually that is something that the railroad would determine because it sets the jobs, and in its business judgment, it can decide the differences between the various positions. It's a judgment as to whether or not somebody is qualified and meets the qualifications, and that's determined by the railroad. And I think there's no evidence that Mr. Elgarman even suggested he was qualified to be an HRO. I believe to the extent Mr. Traubetta in the, either it was in the reply or in the appeal, made arguments that in essence that oftentimes the duties that an HRO are doing are similar to that of alignment. However, the importance here and why a designation is given to an HRO, and it is in the record, is that on the overtime shifts, you do not have a full panoply of individuals there to do jobs. So therefore, the railroad decides what it needs based on its operational needs. Is it electrifying track? Is it putting up more rail? Those are decisions that are made by the railroad, and it posts the positions. Then the union takes over, pursuant to the collective bargaining agreement, and decides the proper way for the assignment of that and whether or not it's being done fairly and equitably. Then after those assignments are made, they're given back to Amtrak, who then, if those slots are not filled, somebody like Mr. Brennan or somebody like Mr. Thackberg can then fill those slots. But at that point, Mr. Grumman would have already not been able to take them, and now it's come back to the railroad. So again, I take the position, and I think it's very clear from the record, that there is absolutely no evidence that any of this was race-based, and I don't think it's a question for a jury as to whether or not the positions could be in any instance similar, because the job duties really are different, there are different requirements, and that is set forth as well. With regard to Mr. Grumman's other arguments, with regard to the affidavit, most of, and we note in our documents, that there's actually no real evidence before this court of discrimination. The record established during his deposition established one set of facts, and we go through a great deal going between what was said at the deposition and then what suddenly came in at the time of his affidavit. But the district court did not rely on the false affidavit doctrine? No, the district court did not rely on the false affidavit doctrine, and I believe the district court did in fact look at all of the various allegations and drew conclusions from the factual record, that there was no evidence to support any connection between Mr. Grumman's claims of racial discrimination or hostile work environment and making out his prima facie case, as such the court ruled in Amtrak's favor. And we believe, Your Honor, that that decision should be upheld for the reasons set forth in our papers and in the record before this court. Now I know I have a minute 41 left and I never want to waste time, but if there's any questions the court would like me to answer, I'm happy to do so. Could you just respond to what was said about Mr. Bendigo and whether the benefit he got from the shift change, assuming that there was a change, was minimal or not? Well, I would look at first in the record whether it was minimal or not is not really the question. When you look at whether it was minimal or not, then you should be looking and focused on the parts of the record where it shows that for each of the years in question, Mr. Garman had more overtime than his two of his white co-workers. That was not what I'm asking. No, I just want to know whether, just commenting on whether the opportunity that was, if we grant, taken from Mr. Garman when it was reallocated, how much of an opportunity was then given to Mr. Bendigo? It's hard to tell in any given instance because it's going to be a question of if it's a first shift overtime and it's an HRO, if Mr. Alves or Mr. Butler takes it, the analysis ends there. It's done. Mr. Garman can't even apply for it. And therefore, whether or not Mr. Bendigo had more opportunity, I believe the record shows he did have the opportunity, but his argument is with regard to the HROs. And our position is with regard to the HROs, which, again, are not as comparators, there are black HROs who chose to be appointed, who chose to take the promotion, which Mr. Garman never elected to do. Thank you.